*Erin Easter v. ZB, National Association*

Notice of Removal

Exhibit D
Amended Complaint

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>Court Address:  1437 Bannock Street<br>            Denver, CO 80202 | |
| **Plaintiff:**   ERIN EASTER<br><br>v.<br><br>**Defendants:**  ZB, NATIONAL ASSOCIATION d/b/a Zions Management Services Company, a national banking company | ▲ **COURT USE ONLY** ▲ |
| Attorneys for Plaintiffs:<br><br>Name:  David Lichtenstein (#11408)<br>         Matt Molinaro (#47814)<br>         Kristina Rosett (#50309)<br>Address:  Law Office of David Lichtenstein, LLC<br>         1556 Williams Street, Suite 100<br>         Denver CO 80218-1661<br>Phone No.:  (303) 831-4750<br>Fax No.:   (303) 863-0835<br>E-mail:    dave@lichtensteinlaw.com<br>         matt@lichtensteinlaw.com<br>         kristina@lichtensteinlaw.com | Case No.: 2018CV31228<br><br>Courtroom: 275 |
| **AMENDED COMPLAINT** ||

Plaintiff Erin Easter, for her Amended Complaint,[1] states:

1.   Plaintiff Erin Easter is a resident of Douglas County, Colorado.

2.   Ms. Easter was at all relevant times an employee of Defendant within the meaning of 29 U.S.C. §203(e) of the Fair Labor Standards Act.

---

[1] Ms. Easter amends as a matter of right. C.R.C.P. 15(a).

3. Defendant ZB, National Association d/b/a Zions Management Services Company is a national banking company and an employer within the meaning of 29 U.S.C. §203(d).

4. This Court has concurrent jurisdiction over this action pursuant to 29 U.S.C. §216(b) of the FLSA.

5. Venue is proper because Zions is a nonresident of Colorado, may be found in the City and County of Denver, and this Complaint designates the City and County of Denver. C.R.C.P. 98(c)(1).

6. Ms. Easter worked as a Quality Control Analyst/Enterprise Mortgage Lending — Originations QC for Defendant from December 7, 2015 to November 9, 2017.

7. Zions is a national banking association whose subsidiaries include multiple banks and lending institutions.

8. One of Zions' business' marketplace offerings is to provide mortgage loans to customers. Ms. Easter's primary job duties directly supported that business purpose.

9. Ms. Easter reviewed individual lending decisions to determine whether they met the contractual obligations, statutory obligations, and underwriting guidelines, all of which were previously established by Zions.

10. Zions misclassified her as an exempt employee during the relevant time period because she was not paid on a salary basis, performed production work, and did not have the requisite level of independent judgment.

11. The Quality Control Analyst job description maintained by Zions states: "Performs audit functions for both risk controls and regulatory Quality Control to ensure compliance and provide framework for management to examine and adjust policy and procedures. Validates standards, measures performance and determines compliance with mortgage originations, which includes monitoring trending, reporting loan defects and ensures that loans delivered to investors meet agency guidelines and sound underwriting decisions. Identifies and assesses operational risk and impact and makes recommendations for effective policies and controls to manage risk within various operational and corporate functions. Re-underwrites original credit and collateral lending decisions, identifying red flags, and determining if targeted loan selections met the terms, conditions, representations and warranties of the applicable contractual documents and underwriting guidelines relevant to the origination and sale of the loan file(s). Additional activities include preparation of written loan summaries. Other duties as assigned."

12. Ms. Easter did not have the individual authority to prevent a loan from closing.

13. She had no authority to deviate from the pre-existing guidelines.

14. Zions provided her with a pre-approved checklist of data and forms to use.

15. Using the checklist, she reviewed a document to confirm all the elements were present and accurate.

16. If the loan did not meet the guidelines or regulations, she noted that finding and sent it to the processor, the underwriter, her supervisor, or other management.

17. If an individual lending decision was ambiguous as to whether it complied with the guidelines, she was required to escalate the issue.

18. Ms. Easter only evaluated individual lending decisions; she did not have any input on the guidelines or Zions' policies.

19. She did not make decisions regarding whether Zions should take on certain kinds of credit risk.

20. She did not assess whether certain loans comported with Zions' business interest.

21. She reviewed individual lending decisions to determine whether they posed a previously identified risk.

22. Each month, Ms. Easter counted exceptions and findings by category to provide "trending" exceptions or violations.

23. Based on her count, she input the data into a spreadsheet and created graphs.

24. Ms. Easter's primary job duties did not directly relate to management policies of Zions, such as determining Zions' overall course or policies.

25. Other than applying existing guidelines to individual lending decisions and providing trending, Ms. Easter did not:

   a. provide a "framework for management to examine and adjust policy and procedures";

   b. provide any adjustments to policies or procedures;

   c. validate standards;

   d. "make[] recommendations for effective policies and controls to manage risk within various operational and corporate functions";

   e. identify or assess operational risk;

   f. recommended a policy to manage risk; or

   g. recommended a control to manage risk.

26. Zions classifies its underwriters as non-exempt.

27. Zions' underwriters apply the same pre-existing guidelines as Ms. Easter to individual lending decisions.

28. Zions required its Quality Control Analyst employees to work the hours necessary to meet deadlines.

29. These deadlines were as brief as 2 to 4 hours.

30. Zions did not require her to track her time or seek approval before working more than forty hours in a week.

31. In fact, Zions specifically directed her not to clock in or out.

32. Zions maintained an internal system to track leave, including vacation and sick time, for exempt employees. That system showed entries for leave accrued and used.

33. Defendants did not ask Ms. Easter to put her hours worked in to that system.

34. Instead, Zions asked the members of the EML/Originations Quality Control team to set their available in-office working hours.

35. The members were expected to schedule about 40 hours per week of available time in the office.

36. The members were expected to work remotely as well.

37. Collectively, the members were to ensure availability at all hours.

38. Because the team reviewed loans from throughout the western United States, Zions members of the team were often responsible for work outside of their office availability.

39. Ms. Easter's in-office availability was from 6:30 AM to 3:30 PM, Monday through Friday.

40. She regularly worked remotely outside of her office availability hours in each workweek.

41. When working remotely, she logged in via a VPN for remote access.

42. When working remotely, she communicated by e-mail with her supervisor and other team members.

43. Ms. Easter regularly worked in excess of forty hours per workweek.

44. Ms. Easter's supervisors were aware that she regularly worked in excess of forty hours per workweek.

45. On August 17, 2016, she e-mailed her supervisor to request time off.

46. In response to the e-mail, her supervisor acknowledged the time she was working over the weekends.

47. On October 17, 2016, Ms. Easter e-mailed her supervisor after she learned that the underwriters in the Denver office were being transferred from exempt to non-exempt.

48. In response to her e-mail, her supervisor told her that he spoke with the Strategic Initiatives Manager and cited the amount of overtime worked by the underwriters as the basis for the change.

49. Despite Defendants' knowledge of Ms. Easter regularly working in excess of forty hours per workweek, Defendants continued to suffer and permit her to do so.

50. Ms. Easter also brought her concerns about her exemption status to Defendants' Human Resources during her employment.

51. She asked about the classification of her job in an August 31, 2017 e-mail to the human resources department.

52. In the August 31, 2017 e-mail, she asked Zions' method for determining she was an exempt employee.

53. Ms. Easter attached materials from the internet, including materials from the U.S. Department of Labor's regulations, addressing the requirements for exempt employees.

54. On October 12, 2017, Zions stated it was "awaiting some feedback from corporate on the Exempt/Non-Exempt status test."

55. Zions relied on its previously written job description to conclude that she was exempt.

56. On November 3, 2017, Zions stated that "when a job is created, the exemption status is determined based on" the job description.

57. Zions has not reviewed its across-the-board policy of designating all Quality Control Analyst employees as exempt.

58. Zions has not done so since the job description was drafted and prior to 2018.

59. Zions did not investigate Ms. Easter's job duties between August 2017 and October 2017.

60. Zions did not investigate the job duties of any member of the team between August 2017 and November 2017.

61. Zions did not investigate the job duties of any member of the team between December 7, 2015 to November 9, 2017.

62. Zions stated in the November 3, 2017 e-mail that the exempt duties must be the primary duties and that it follows the guideline of "more than 50%" of duties and that it "can" update the job description.

63. Zions did not make any attempt to update or review her job.

64. Zions did not determine the time allocation between exempt duties and non-exempt duties for Ms. Easter.

65. Zions did not determine the time allocation between exempt duties and non-exempt duties for other members of her team.

66. Zions did not confer with counsel in response to her question about her exempt status.

67. Zions did not confer with the United States Department of Labor in response to her question about her exempt status.

68. Zions did not consult any regulations or guidance from the United States Department of Labor, other than those provided by Ms. Easter.

69. Defendants paid Ms. Easter the same salary each pay period, except in some pay periods when Zions reduced her pay.

70. Zions did not increase Ms. Easter's salary in any pay period to pay her additional compensation for working more than 40 hours in a workweek.

71. Zions made deductions from her salary for partial-day absences.

72. Zions purportedly maintained a benefit plan with a leave bank.

73. The policy required employees to work a minimum of four hours to be paid for a full day.

74. When an employee exhausted her leave bank, Zions deducted the missed time from the employee's salary pursuant to its policy.

75. The policy applied to employees who it classified as non-exempt.

76. The policy applied to Ms. Easter.

77. Zions made deductions from Ms. Easter's salary when she exhausted her leave bank and had a partial-day absence worked less than four hours in September 2016.

**FIRST CLAIM FOR RELIEF**
(Fair Labor Standards Act -- Overtime Compensation)

78. Zions was required to pay Ms. Easter time-and-a-half pay for hours she worked in

excess of forty per workweek.

79. Ms. Easter worked in excess of forty hours per workweek in all or nearly all of the workweeks between December 7, 2015 to November 9, 2017.

80. Ms. Easter was not paid for the hours that she worked in excess of forty per workweek.

81. Defendants' violation of the FLSA was willful under 29 U.S.C. §255(a) because Defendants either knew or acted with a reckless disregard for the fact that Ms. Easter was entitled to overtime under the FLSA.

82. Ms. Easter is also entitled to recover from Defendants liquidated damages, reasonable attorneys' fees, costs, and interest, all as contemplated by 29 U.S.C. §216(b) of the FLSA.

## SECOND CLAIM FOR RELIEF
(Breach of Contract)

83. Defendants' failure to pay Ms. Easter overtime was a breach of her contract of employment, express or implied.

84. Zions handbook expressly states that "all time worked will be paid at the appropriate overtime rate."

85. Zions failed to pay Ms. Easter for all time worked at the appropriate overtime rate.

86. Because it did not pay her for all time worked, Zions has been unjustly enriched at Ms. Easter's expense.

87. As a direct and proximate result of such breach, she has suffered damages equal to the unpaid amounts.

## DEMAND FOR JUDGMENT

Plaintiff Erin Easter demands judgment in her favor and against Defendants, jointly and severally, for:

A. All earned and unpaid overtime compensation owed to her;

B. Liquidated damages under the FLSA;

C. Attorneys' fees;

D. Prejudgment and post judgment interest;

    E.  Costs; and

    F.  Such other relief as the Court deems proper.

Dated: June 7, 2018

                               This document, with original or scanned signatures, is available for inspection at the office of undersigned counsel.

                               <u>s/ Matt Molinaro</u>
                               David Lichtenstein
                               Matt Molinaro
                               Kristina Rosett
                               *Attorneys for Plaintiff*

Address of Plaintiff:
558 E. Castle Pines Pkwy., B4192
Castle Pines, CO 80108

8