## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01659-STV

ERIN EASTER,

      Plaintiff,

v.

ZIONS BANCORPORATION, NATIONAL ASSOCIATION,
d/b/a Zions Management Services Company,
a national banking company,

      Defendant.

_____

## ORDER
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [#33] and Defendant's Motion for Summary Judgment ("Defendant's Motion") [#32] (collectively, the "Motions").  The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment.  [##15, 16]  This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions.  For the following reasons, Plaintiff's Motion [#33] is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion [#32] is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**[1]

Plaintiff Erin Easter was employed by Defendant Zions Bancorporation, d/b/a Zions Management Services Company, from November 7, 2015 to November 12, 2017 as a Quality Control Analyst II ("QC Analyst").  [#42-1, ZSOF2]  Defendant is a national bank and an employer within the meaning of the Fair Labor Standards Act ("FLSA").  [*Id.* at ZSOF1]   Plaintiff was assigned to the Risk Management Unit within Defendant's Enterprise Mortgage Lending division.  [*Id.* at ZSOF2]

Plaintiff's department was responsible for reviewing the work of the loan originators, processors, underwriters, and closers.  [#43-1, ESOF3]  As a QC Analyst, Plaintiff performed audit and quality control functions for loan originations.  [#42-1, ZSOF3]  The job description for the QC Analyst position sets forth the job duties as follows:

> Performs audit functions for both risk controls and regulatory Quality Control to ensure compliance and provide framework for management to examine and adjust policy and procedures.  Validates standards, measures performance and determines compliance with mortgage originations, which includes trending, reporting loan defects and ensures that loans delivered to investors meet agency guidelines and sound underwriting decisions. Identifies and assesses operational risk and impact and makes recommendations for effective policies and controls to manage risk within various operational functions.  Re-underwrites original credit and collateral lending decisions, identifying red flags, and determining if targeted loan selections met the terms, conditions, representation and warranties of the applicable contractual documents and underwriting guidelines relevant to the origination of the loan file(s).  Additional activities include preparation of written loan summaries.  Other duties as assigned.

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Plaintiff's Motion for Summary Judgment (the "Easter Statement of Facts") [#43-1] and the Separate Statement of Facts filed with Defendant's Motion for Summary Judgment (the "Zions Statement of Facts") [#42-1].  The Court refers to the sequentially numbered facts set forth in the Easter Statement of Facts as "ESOF#" and refers to the sequentially numbered facts set forth in the Zions Statement of Facts as "ZSOF#."  The Court periodically cites directly to the exhibits cited by the parties to provide additional context.

[*Id.* at ZSOF8; *see also* #32-7]

The parties dispute whether Plaintiff's duties differed from those set forth in the job description.  [#42-1, ZSOF10]   Nonetheless, the parties agree that, due to Plaintiff's expertise in the specialized area of flood insurance, Plaintiff spent most of her time reviewing individual mortgage loan files for properties located in flood zones.[2]  [*Id.* at ZSOF30]  This was the only task that she performed on a daily basis.  [*Id.*]

For properties located in flood zones, an underwriter would need to send the file to a QC Analyst for review before the loan could be funded.  [#43-1, ESOF5]  The QC Analyst would consult lengthy checklists to determine whether certain conditions were satisfied.  [#42-1, ZSOF38; *see also* #32-13 at 21-24; #33-7]  Defendant provided Plaintiff with these checklists.  [#43-1, ESOF17]   Plaintiff had some role in modifying the checklists, though the parties dispute the extent of that role.  [*Id.* at ESOF18-19; #42-1, ZSOF36]   There was a general pre-funding checklist that appears applicable to all mortgage loans, and a separate checklist that was specific to loans for properties located in flood zones.  [#43-1, ESOF20; *see also* #32-13 at 21-24; #33-7]

Some of the questions on the checklists were straightforward and easily answered. For example, the checklists asked whether the initial application was in the file, whether the initial application was signed and dated by all parties, whether the income

_____

[2] Defendant maintains that Plaintiff performed other tasks besides reviewing these files. [#43-1, ESOF8]  Nonetheless, Defendant does not dispute that at times the majority of Plaintiff's time was spent reviewing such files.  [#42-1, ZSOF30; *see also* #43-1, ESOF9] Nor does Defendant dispute that the majority of all QC Analysts' time was spent reviewing loan files generally.  [#43-1, ESOF16]   Ultimately, the Court's conclusion is the same regardless of whether Plaintiff spent the majority of her time reviewing loan files generally or reviewing flood loan files more specifically.

documentation was less than 120 days old, and whether certain notices had been provided at least ten days prior to closing.  [#32-13 at 21-24; #33-7]  Other questions, however, appear to involve more subjective evaluations.  For example, the checklists ask whether adverse credit history was "adequately explained," whether the income documentation was "sufficient and from acceptable sources," whether the appraiser "adequately described" the neighborhood and site, and whether there was "adequate evidence" of flood insurance coverage in the file prior to closing.  [*Id.*]  Plaintiff did not have any authority to deviate from the checklists.  [#43-1, ESOF41]

In reviewing flood insurance issues, Plaintiff was making determinations about "Level 3 issues, the most serious from a risk-perspective analysis."  [#42-1, ZSOF#34] Whenever there was a grey area, and Plaintiff was unsure whether her flood analysis complied with federal regulations, she would consult either higher management or the Compliance Department.  [*Id.* at ZSOF37; #43-1, ESOF40]  Plaintiff testified that she consulted the Compliance Department about once a month and consulted higher management about twice a week.  [#42-1, ZSOF41-42]

Upon completing the flood review checklist, Plaintiff would email the checklist to the loan originators and processors.[3]  [#43-1, ESOF23; *see also* #33-2 at ¶ 7]  If Plaintiff noted an error, known as an "exception," during her pre-funding review, she would escalate that exception to her managers and the Compliance Department.  [#42-1, ZSOF20; #43-1, ESOF24; *see also* #33-2 at ¶¶ 7, 16]  Such an exception could prevent the funding of the loan.  [#43-1, ESOF6]  On the other hand, if a file was approved by

---

[3] Plaintiff did not deal directly with borrowers and did not have any role in promoting or selling any product or service to customers. [#42-1, ZSOF46]

Plaintiff's department, the loan was typically funded and closed.  [*Id.* at ESOF3]  Despite the fact that her review could impact whether a loan was approved or funded, Plaintiff herself could neither approve a loan nor make decisions regarding whether Defendant should take on certain kinds of credit risk.  [*Id.* at ESOF36, 38]  Of her flood review work, Plaintiff spent approximately 75 percent of her time reviewing files before the loan closed.  [*Id.* at ESOF10]

The remaining 25 percent of Plaintiff's flood review work involved reviewing files after the loan closed.  [*Id.*]  After a loan in a flood zone closed, the Quality Control Department would review some files to ensure full compliance.  [*Id.* at ESOF7]  As she did with her pre-closing reviews, Plaintiff utilized a checklist to conduct the post-closing reviews.  [#42-1, ZSOF40; *see also* #32-13 at 4-6]  The post-closing checklist asked similar questions to the pre-closing checklists.  [*Compare* #32-13 at 4-6, *with id.* at 21-24]  The post-closing checklist was promulgated by a third-party vendor, Banker's Advisory, but Plaintiff and her co-workers made some revisions to the checklist.  [#42-1, ZSOF17, 40]  The parties dispute whether Plaintiff's revisions were substantive or merely stylistic.  [*Id.* at ZSOF40]

As part of her post-funding review, Plaintiff would look for red flags, which were extreme errors.  [*Id.* at ZSOF29; #43-1, ESOF15]  One example of a red flag would be when a file closed without a pre-funding flood review.  [#43-1, ESOF15]  Such red flags were rare, generally occurring only a couple of times per month.  [*Id.*]

In addition to directly reviewing loan files, Plaintiff was also involved in the review of loan audits conducted by Banker's Advisory.  [#42-1, ZSOF17]  Plaintiff conducted a monthly "post-closing" review of Banker's Advisory's loan audits.  [*Id.*]  This post-closing

review appears to have two primary components.  First, according to Plaintiff, she and another employee would review the loan documentation presented by Banker's Advisory for any findings that Banker's Advisory would point out.  [#32-4 at 61 (240:11-21)]  If Plaintiff and the other employee agreed with the findings, they would not make any changes.  [*Id.* (240:21-22)]  If they disagreed, Plaintiff would tell Banker's Advisory about the disagreement and Banker's Advisory would have an opportunity to respond.  [*Id.* at 61-62 (240:22-241:3)]  Second, Plaintiff would take a limited sample of the loans audited by Banker's Advisory and conduct a complete due diligence review of those loans.  [#42-1, ZSOF17]

In addition to her review of loan files, Plaintiff was also responsible for aggregating the number of exceptions and providing the monthly aggregate to management.  [*Id.* at ZSOF21; #43-1, ESOF12]  Management told Plaintiff which numbers to aggregate.  [#43-1, ESOF13]  Management likewise decided whether any action should be taken based upon the numbers Plaintiff provided.  [*Id.* at ESOF14]  Some of these reports would eventually go to Defendant's Board of Directors.  [#42-1, ZSOF21; *see also* #32-4 at 47 (195:2-6)]  The results of the reports would be used to guide bank policy for Sarbanes-Oxley compliance.  [#42-1, ZSOF44]  Nonetheless, Defendant is unaware of any specific policy changes that resulted solely from Plaintiff's actions.  [#43-1, ESOF34]

As a QC Analyst, Plaintiff earned an annual salary of between $70,000 and $72,000.  [#42-1, ZSOF5]  Defendant classified Plaintiff's QC Analyst position as an exempt administrative position under the FLSA.  [#42-1, ZSOF6]  Defendant made the classification before it had hired anyone to fill the position and, as a result, Defendant primarily relied upon the QC Analyst job description in concluding that the position was

an exempt administrative position.  [*Id.* at ZSOF12; #43-1, ESOF53]  Because Defendant

determined that the position was exempt from FLSA's requirements, Defendant did not

pay Plaintiff overtime despite knowing that Plaintiff occasionally worked more than forty

hours per week.  [#43-1, ESOF43-44]

In August 2017, Plaintiff raised concerns with human resources that her position

was misclassified as exempt.  [#42-1, ZSOF47]  Plaintiff's concerns were brought to the

attention of Jonathan Hart, the human resources professional who originally classified the

position as exempt.  [#32-6 at 7-8 (194:20-195:5), 11-12 (204:22-205:5)]  According to

Mr. Hart, he "reviewed the job in . . . with the management team to make sure that the job

description accurately reflected the job duties of what the quality control analysts were

doing, and [he] received an answer that . . . the job description was accurate."  [*Id.* at 13-

14 (206:22-207:2)]  Following Mr. Hart's discussions, Defendant did not change Plaintiff's

classification to non-exempt.  [#42-1, ZSOF48]

In May 2018, Defendant hired an outside law firm to independently review whether

the QC Analyst position was properly classified as exempt.  [*Id.* at ZSOF49; #43-1,

ESOF58]  This law firm did not interview Plaintiff, though it did interview three other QC

Analysts regarding their job duties.  [#43-1, ESOF59]  While ultimately concluding that

the QC Analyst position should remain exempt, the outside firm acknowledged that "the

position does not so obviously exceed the requirements for the administrative exemption

such that any risk of an opposite determination is entirely foreclosed."  [*Id.* at ESOF62;

#32-14 at 3]

During the relevant time-period, Defendant had an Employee Handbook.  [#42-1,

ZSOF51; *see also* #32-15; #36-5]  Section 3-2 of the Employee Handbook described the

differences between exempt and non-exempt employees.  [#36-5 at 6]  It explained that exempt employees do not receive overtime pay, while non-exempt employees were entitled to overtime pay for hours worked in excess of forty per week.  [*Id.*]  For non-exempt employees, the Employee Handbook provides that "all time worked will be paid when required by applicable law at the appropriate overtime rate."  [*Id.* at 9]  The Handbook Overview section of the Employee Handbook states: "This Handbook is intended to be an outline of policies and procedures only and, except for the arbitration provisions (which do create a binding dispute resolution contract), does not create a contract of continued employment, nor does it create any enforceable contractual, equitable, or other rights."  [#32-15 at 6 (emphasis omitted)]

On April 6, 2018, Plaintiff initiated this action in the District Court for the City and County of Denver.  [#3]  Defendant removed the matter to this Court on June 29, 2018. [#1]  The Amended Complaint brings two causes of action: (1) violation of the FLSA for failing to pay overtime compensation, and (2) breach of contract.  [#4]  On June 21, 2019, Defendant moved for summary judgment [#32] and Plaintiff moved for partial summary judgment [#33].  Each side has responded to the other party's motion [##36, 37], and each side has filed a reply in support of their motions [##42, 43].

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view

each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting

9

*Inc.*, 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury.  *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.    Analysis

Plaintiff asserts two claims for relief: (1) violation of the FLSA for failing to pay overtime compensation, and (2) breach of contract.  [#4]  Defendant moves for summary judgment on each claim.  [#32]  Plaintiff moves for summary judgment as to liability on her FLSA claim, as well as for summary judgment on the following affirmative defenses asserted by Defendant: Plaintiff was a bona-fide administrative employee (third affirmative defense), Defendant acted in good faith pursuant to 29 U.S.C. § 259 (fourth affirmative defense), and Defendant is not liable for liquidated damages because it acted in good faith pursuant to 29 U.S.C. § 260 (fifth affirmative defense).  [#33; *see also* #14 at 18-19]  Plaintiff also seeks summary judgment on the issue of liquidated damages. [#33 at 5]  The Court first addresses Plaintiff's FLSA claim, then considers the breach of contract claim.  Where the Motions overlap, the Court addresses the legal arguments

together.  *See Azzun v. Kan. Dep't of Health & Env't*, No. 09-4144-SAC, 2010 WL 4975557, at *1 (D. Kan. Dec. 2, 2010).

## A.  FLSA Claim

In its Answer, Defendant has asserted nine affirmative defenses.  [#14 at 18-19] Of relevance to the instant Motions are affirmative defenses three, four, and five.  The third affirmative defense asserts that Plaintiff was an exempt employee under 29 U.S.C. § 213(A)(1).  [*Id.* at 18]  The fourth affirmative defense raises a good faith defense pursuant to 29 U.S.C. § 259.  [*Id.*]  The fifth affirmative defense asserts that Defendant is not liable for liquidated damages under the 29 U.S.C. § 260 good faith defense.  [*Id.*] Plaintiff's Motion seeks summary judgment on each of these defenses, as well as on her entitlement to liquidated damages under the FLSA.  [#33 at 5]  Defendant's Motion seeks summary judgment on Plaintiff's FLSA claim in its entirety, arguing that Plaintiff is an exempt employee.  [#32 at 5-16]  The Court addresses these arguments below.

### 1.  The Administrative Exemption Defense

Under the FLSA, an employer must pay an employee overtime compensation at a rate not less than one and one-half times the regular rate at which the employee is employed for all hours that the employee works in a given week above 40 hours.  29 U.S.C. § 207(a)(1).  But, "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from this requirement.  29 U.S.C. § 213(a)(1).  Citing Section 213(a)(1) and the administrative exemption, Defendant argues that Plaintiff is exempt from the FLSA's overtime requirements.  [#32 at 5-16]  Defendant bears the burden of demonstrating that a Section 213(a)(1) exemption applies.  *See Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008).

To qualify as an administrative employee, three conditions must be satisfied.  First, the employee must be compensated on a salary or fee basis at a rate of not less than $455 per week.  29 C.F.R. § 541.200(a)(1).  Second, the employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  *Id.* § 541.200(a)(2).  Finally, the employee's "primary duty" must "include[] the exercise of discretion and independent judgment with respect to matters of significance."  *Id.* § 541.200(a)(3).  Here, only the second and third conditions are in dispute and thus the Court considers Plaintiff's primary duty.  [*See generally* ##32, 33]

To determine whether the administrative exemption applies, the Court "must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections."  *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012) (analyzing primary duty for executive and administrative exemptions); 29 C.F.R. § 541.700(a) ("To qualify for exemption under this part, an employee's 'primary duty' must be the performance of exempt work.").  "Time spent performing each duty is a 'useful guide' in examining which duty is primary, but there is no requirement that an exempt executive employee spend more than half her time on managerial tasks."  *Maesta*s, 664 F.3d at 827.  "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700.  Among the factors the Court should consider in determining an employee's primary duty are "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from

direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

"[T]he regulations make clear that [the primary duty] question[] should be resolved by examining the employees' *actual* job characteristics and duties." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010) (emphasis added). Thus, "even where an employee's job description appears to exempt him from eligibility for FLSA overtime pay, if that employee's actual duties vary from the seemingly exempt description, such that they are engaged primarily in rote, manual, and non-discretionary tasks, he would be misclassified, despite the exempt nature of his job description." *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 638 (S.D.N.Y. 2013).

Here, the undisputed facts demonstrate that Plaintiff's primary duty involved reviewing individual mortgage loan files and ensuring that those loan files satisfied certain conditions set forth in checklists that were originally provided by Defendant.[4] [#42-1, ZSOF30, 38; #43-1, ESOF17; *see also* #32-13 at 21-24; #33-7] There was a general pre-funding checklist that appears applicable to all mortgage loans, and a separate checklist that was specific to loans for properties located in flood zones. [#43-1, ESOF20; *see also* #32-13 at 21-24; #33-7] Some of Plaintiff's work involved reviewing loans before they closed, while others involved reviewing loans post-closing. [#43-1, ESOF10] Plaintiff spent the majority of her time conducting these reviews, which were the most important aspect of her job. [#42-1, ZSOF30; #43-1, ESOF9, 16]

---

[4] As indicated earlier, there was some dispute amongst the parties as to whether Plaintiff spent most of her time reviewing flood loan files, or loan files generally. *See supra* Note 2. Ultimately, that dispute is immaterial to the Court's analysis.

Having determined Plaintiff's primary duty, the Court next considers whether Plaintiff's primary duty was directly related to management or general business operations, and whether she exercised discretion and independent judgment in conducting that duty, under the second and third prongs of the administrative employee test.

### a. Whether Plaintiff's duties were directly related to management or general business operations

Under the second condition, "[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.201(a).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  *Id.*  This distinction has been referred to as the administrative/production dichotomy.  *McKeen-Chaplin v. Provident Sav. Bank*, 862 F.3d 847, 851 (9th Cir. 2017); *Bollinger v. Residential Capital, LLC*, 863 F. Supp. 2d 1041, 1046-47 (W.D. Wash. 2012); *see also Hamby v. Associated Ctrs. For Therapy*, 230 F. App'x 772, 783 (10th Cir. 2007) (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)).

The Administrator has cautioned, however, that the "dichotomy has [n]ever been [n]or should be a dispositive test for exemption."  69 Fed. Reg. 22122, 22141 (Apr. 23, 2004).  Indeed, the dichotomy "is only determinative if the work falls squarely on the production side of the line."  *Id.* (quotation omitted).  And, courts have noted that the "dichotomy's focus on a traditional manufacturing line makes it 'not terribly useful' when

applied to service workers." *Bollinger*, 863 F. Supp. 2d at 1047 (*quoting Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008)).

Not only is the administrative/production dichotomy not very useful in addressing whether Plaintiff's duties in reviewing mortgage loan files were directly related to management or general business operations, neither the parties nor the Court's independent research have identified any Tenth Circuit precedent that could assist in this determination. And, in the analogous context of loan underwriters, courts are split. *Compare McKeen-Chaplin*, 862 F.3d at 851-854 (finding underwriter duties related to production, and holding underwriters were not exempt under FLSA), *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 532-37 (2d Cir. 2009) (same), *and Watts v. Silverton Mortg. Specialists, Inc.*, 378 F. Supp. 3d 1164, 1173-74 (N.D. Ga. 2019) (same), *with Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 992-96 (6th Cir. 2016) (finding underwriter duties were related to management and thus underwriters met the second prong of the administrative exemption). Ultimately, the Court need not resolve whether Plaintiff's duties were related to management or general business operations because, as detailed below, the Court concludes that the undisputed facts demonstrate that Plaintiff did not exercise discretion and independent judgment in her primary duty.

### b. Whether Plaintiff exercised discretion and independent judgment on matters of significance

To qualify for the administrative exemption under the third prong, "an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). In general, this "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* "The exercise of

discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." *Id.* § 541.202(c). Nonetheless, employees can still exercise discretion and independent judgment even when their decisions or recommendations are reviewed at a higher level. *Id.* But "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e). Nor does the fact that the employer may experience financial loss as a result of the employee's performance necessarily imply that the employee exercises discretion and independent judgment. *Id.* § 541.202(f).

According to the regulations:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b)

Applying these standards, Plaintiff did not exercise discretion and independent judgment in performing her primary duty. Again, Plaintiff's primary duty was the review of loan files, ensuring that those files satisfied certain conditions set forth in various

checklists.  [#42-1, ZSOF30, 38; #43-1, ESOF17; *see also* #32-13 at 21-24; #33-7]  Those checklists were provided by Defendant and Plaintiff did not have any authority to deviate from the checklists.  [#42-1, ZSOF38; #43-1, ESOF17, 41]  Whenever there was a grey area and Plaintiff was unsure whether her flood analysis complied with federal regulations, she would consult either higher management or the Compliance Department.  [#42-1, ZSOF37; #43-1, ESOF40]  Plaintiff herself could neither approve a loan nor make decisions regarding whether Defendant should take on certain kinds of credit risk.  [#43-1 at ESOF36, 38]

As these descriptions of Plaintiff's primary duty demonstrate, Plaintiff did not have the "authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c).  Nor did she make comparisons and evaluations of possible conduct and then act after the various possibilities were considered.  *Id.* § 541.202(a).  Plaintiff did not have the authority to: (1) formulate, affect, interpret, or implement management policies or operating practices, (2) waive or deviate from established policies and procedures without prior approval, or (3) negotiate and bind the company on significant matters, or, indeed, negotiate on behalf of the company at all. *See id.* § 541.202(b).  Plaintiff was not involved in planning business objectives, nor did she represent the company in handling complaints, arbitrating disputes, or resolving grievances.  *Id.*  Moreover, while Plaintiff's decisions could lead to the approval of loans that could have a significant financial impact, thereby affecting business operations, *id.*, such decisions were made by reviewing a checklist provided by the Defendant and from which Plaintiff could not deviate [#42-1, ZSOF38; #43-1, ESOF17, 41].  Similarly, while Plaintiff's review of the flood files could be seen as investigating and resolving matters of

significance on behalf of management, 29 C.F.R. § 541.202(b), again she was cabined in that discretion by checklists from which she could not diverge [#42-1, ZSOF38; #43-1, ESOF17, 41].

Defendant argues that Plaintiff "performed other significant job functions that squarely meet the administrative exemption" including "prepar[ing] reports that were provided to [Defendant's] board of directors." [#32 at 14] Certainly, the fact that an employee provides consultation or expert advice to management can support a finding that the employee exercised independent judgment on matters of significance. 29 C.F.R. § 541.202(b). But there are two problems with this argument here. First, as detailed above, preparing such reports was not part of Plaintiff's primary duties. Second, Plaintiff's reports were nothing more than an aggregation of the number of exceptions noted in Plaintiff's pre-funding review. [#42-1, ZSOF21; #43-1, ESOF12] Management told Plaintiff which numbers to aggregate, and likewise decided whether any action should be taken based upon the reports Plaintiff prepared. [#43-1, ESOF13-14] Thus, Plaintiff's preparation of these monthly reports does not demonstrate the exercise of discretion and independent judgment needed to qualify for the administrative exemption.

Undoubtedly, Plaintiff exercised some skill in conducting her file reviews. Plaintiff had to determine whether adverse credit history was "adequately explained," whether the income documentation was "sufficient and from acceptable sources," whether the appraiser "adequately described" the neighborhood and site, and whether there was "adequate evidence" of flood insurance coverage in the file prior to closing. [#32-13 at 21-24; #33-7] But the fact that Plaintiff needed skill and experience to answer these questions is not the same as exercising discretion and independent judgment. 29 C.F.R.

§ 541.202(e) ("The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."). Plaintiff used skill to determine whether the standards and guidelines set forth in the checklists were satisfied, but she did not have any authority to deviate from the established standards and guidelines. [#43-1, ESOF41] Under such circumstances, Plaintiff did not exercise discretion and independent judgment. *See Watts*, 378 F. Supp. 3d at 1174-75 (finding underwriter plaintiff, who reviewed guidelines and determined whether the loan fell within the parameters of risk set by those guidelines, did not truly exercise independent judgment, but rather, "us[ed] her training and years of experience to arrive at decisions that comported with, and were guided by, the guidelines"); *Bollinger*, 863 F. Supp. 2d at 1049 (concluding mortgage underwriters were not exempt employees because they "did not perform the sort of high-level analysis and counseling that constitutes exempt administrative work in the financial services industry," since "[t]heir duties—validating information and ensuring compliance—were merely the final step in Defendants' day-to-day business of selling mortgages"). Thus, because the undisputed facts demonstrate that Plaintiff's primary duty did not involve the exercise of discretion and independent judgment, the Court concludes as a matter of law that the administrative exemption does not apply. Accordingly, the Court **GRANTS** Plaintiff's Motion to the extent it seeks summary judgment on Defendant's third affirmative defense.

### 2. The § 259 good faith defense

Defendant's fourth affirmative defense is a good faith defense pursuant to 29 U.S.C. § 259. [#14 at 18] Section 259 provides a defense to any defendant who "pleads

and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [the Administrator], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged." 29 U.S.C. § 259(a).  As the plain language of Section 259 indicates, however, the employer may only assert a Section 259 defense if it "relied on a[n] [agency] interpretation that specifically addresses its circumstances." *Perry v. Randstad Gen. Partner (US) LLC*, 876 F.3d 191, 214 (6th Cir. 2017) (quotation omitted).  Defendant has not pointed the Court to any "written administrative regulation, order, ruling, approval, or interpretation" that it relied upon in concluding that Plaintiff's position was exempt from overtime requirements. Accordingly, Defendant's Section 259 defense fails as a matter of law and the Court **GRANTS** Plaintiff's Motion to the extent it seeks summary judgment on Defendant's fourth affirmative defense.  Because the third and fourth affirmative defenses are the only defenses at issue related to liability,[5] the Court **GRANTS** Plaintiff's Motion to the extent it seeks judgment as to liability on her FLSA claim and **DENIES** Defendant's Motion to the extent it seeks summary  judgment on that claim.

### 3. The § 260 good faith defense

Plaintiff seeks summary judgment on her request for liquidated damages.  [#33 at 19-21]  "Generally, an employer in violation of the FLSA is liable for both compensatory damages as well as an additional equal amount of liquidated damages, essentially

---

[5] Defendant's only other specific affirmative defense related to liability on the FLSA claim is that Defendant lacked actual or constructive notice that Plaintiff worked in excess of forty hours per work week.  [#14 at 19]  Defendant has since admitted that it was aware that Plaintiff occasionally worked more than forty hours per work week.  [#43-1, ESOF43-44]

doubling the plaintiffs' damage award." *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1272 (10th Cir. 2011) (quotation omitted).  But under 29 U.S.C. § 260, "if the employer can establish that his conduct was both in good faith and based on a reasonable belief that his conduct was not in violation of the FLSA, the court may, in its discretion, award less or no liquidated damages." *Id.*  Defendant's fifth affirmative defense asserts good faith under § 260.  [#14 at 18-19]  The good faith defense "has two components: the employer must show that subjectively, it had an honest intention to ascertain and follow the dictates of [the FLSA]; it must also show that, objectively, its belief that it was in compliance with the FLSA was reasonable." *Johnson v. Colo. Seminary*, 17-cv-02074-MSK-KMT, 2019 WL 4306197, at *6 (D. Colo. Sept. 11, 2019) (emphasis and quotations omitted); *see also Mumby*, 636 F.3d at 1272.

Here, Mr. Hart, a human resource professional, initially classified Plaintiff's position as exempt, based upon the QC Analyst position description.  [#42-1, ZSOF12; #43-1, ESOF53]  After Plaintiff raised concerns in August 2017, Mr. Hart "reviewed the job . . . with the management team to make sure that the job description accurately reflected the job duties of what the quality control analysts were doing, and [he] received an answer that . . . the job description was accurate."  [#32-6 at 13-14 (206:22-207:2)]  Eventually, Defendant hired an outside law firm to independently review the QC Analyst position and that law firm concluded that the position was properly classified as exempt.  [#42-1, ZSOF49, 62; #32-14 at 3]  Given this background, the Court cannot conclude, as a matter of law, that subjectively Defendant lacked an honest intention to follow the dictates of the FLSA.

Nor can the Court conclude, as a matter of law, that Defendant's belief was objectively unreasonable. There is no Tenth Circuit precedent that clearly addresses or classifies Plaintiff's position. And, as detailed above, circuits are split on whether the analogous mortgage underwriter position qualifies for the administrative exemption. Given this uncertainty, the Court cannot conclude, as a matter of law, that Defendant's belief that Plaintiff's position was exempt was objectively unreasonable. In short, the Court cannot find that the Section 260 good faith defense does not apply as a matter of law. Accordingly, the Court **DENIES** Plaintiff's Motion to the extent it seeks summary judgment on Defendant's fifth affirmative defense and to the extent it seeks summary judgment on the request for liquidated damages.

### B. Breach of Contract Claim

In addition to her FLSA claim, Plaintiff also brings a breach of contract claim. [#4 at 8] Specifically, Plaintiff maintains that Defendant breached the Employee Handbook by failing to pay Plaintiff appropriate overtime wages. [*Id.*] Defendant has moved for summary judgment on that claim. [#32 at 16-18]

"Under Colorado law, an employee asserting a contract claim based on an employee handbook is required to show that the employer's words or actions 'manifested to a reasonable person an intent to be bound by the provisions' of the handbook." *Oldershaw v. DaVita HealthCare Partners, Inc.*, No. 15-cv-01964-MSK-NYW, 2019 WL 427650, at *13 (D. Colo. Feb. 4, 2019) (quoting *Romstad v. City of Colo. Springs*, 650 F. App'x 576, 580 (10th Cir. 2016)). "[A] handbook will not create a contract 'where a clear disclaimer of any contractual rights appears.'" *Id.* (quoting *Romstad*, 650 F. App'x at 580). Nonetheless, "Colorado courts do not consider a disclaimer 'clear and conspicuous' if it

is 'inconspicuously placed in an appendix to the handbook.'" *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1324 (10th Cir. 2005) (quoting *Ferrera v. Nielsen*, 799 P3d 458, 461 (Colo. App. 1990)).

Here, the Handbook Overview section of the Employee Handbook states: "This Handbook is intended to be an outline of policies and procedures only and, except for the arbitration provisions (which do create a binding dispute resolution contract), does not create a contract of continued employment, nor does it create any enforceable contractual, equitable, or other rights." [#32-15 at 6 (emphasis omitted)] The disclaimer is located on the first substantive page of the Employee Handbook, in the third paragraph. [*Id.*] Given this disclaimer, found in the beginning of the Employee Handbook, no reasonable person would believe that Defendant intended to be bound by the Employee Handbook's non-arbitration related provisions.[6] As a result, the Court **GRANTS** Defendant's Motion to the extent it seeks summary judgment on Plaintiff's contract claim and judgment will enter in favor of Defendant on that claim.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [#33] is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion for Summary Judgment [#32] is **GRANTED IN PART** and **DENIED IN PART**.  Specifically,

---

[6] Plaintiff argues that the disclaimer is invalid because, located at the first substantive page, the disclaimer was  21 pages away from the language about Defendant's overtime policy.  [#36 at 19]  But Colorado courts have found disclaimers located on the first page of a handbook to be sufficiently conspicuous and clear.  *Ferrera*, 799 P.2d at 461; *see also Kooienga v. Guar. Bank & Tr. Co.*, No. 1:17-cv-00537-LTB-KLM, 2018 WL 6589815, at *8 (D. Colo. Dec. 14, 2018) (holding disclaimer found on first page of handbook was clear and conspicuous); *Healion v. Great-West Life Assurance Co.*, 830 F. Supp. 1372, 1375 (D. Colo. 1993) (finding disclaimer sufficiently conspicuous when found in the preface section of the handbook in a section entitled "About Your Handbook").

(1)    Plaintiff's Motion is **GRANTED** to the extent it seeks summary judgment as to liability on her FLSA claim, **GRANTED** to the extent it seeks summary judgment on Defendant's third and fourth affirmative defenses, but **DENIED** to the extent it seeks summary judgment on Defendant's fifth affirmative defense or Plaintiff's entitlement to liquidated damages; and

(2)    Defendant's Motion is **GRANTED** to the extent it seeks summary judgment on Plaintiff's contract claim but **DENIED** to the extent it seeks summary judgment on Plaintiff's FLSA claim;

(3)    Judgment shall enter in favor of Defendant on Plaintiff's breach of contract claim.


DATED:  October 16, 2019                    BY THE COURT:


                                            s/Scott T. Varholak
                                            United States Magistrate Judge